ROBERT H. BOGGS ET AL. V. IDA M. BOGGS.

FILED JUNE 19, 1901.    No. 9,780

Commissioner's opinion, Department No. 2.

1. **Wills:** UNDUE INFLUENCE. Undue influence, in order to invalidate a will, must be of such character as to destroy the free agency of the testator and substitute another person's will for his own.

2. ——: ——: NATURE OF INFLUENCE. It may consist in constant pressure of importunity or persuasion, whereby the mind of the testator is not left free to act. But in such case there must be such a degree of urgent solicitation that, under the circumstances, and considering the testator's condition of mind and body, he was too weak to resist it and acted under constraint of fear, desire for peace, or some other motive than affection or an intelligent sense of duty.

3. **Husband and Wife.** Although in general confidential relations may raise strong suspicion of undue influence, this is not true to the same extent of the relation of husband and wife, where the relation has subsisted for a long time under circumstances which give rise to a strong legitimate influence and the disposition in question is not unjust or unnatural.

4. **Burden Upon Contestants.** The burden is upon the contestants to establish undue influence, and in so doing it is not enough to show that the circumstances attending execution of the will are consistent with the hypothesis of its having been obtained by undue influence; it must be shown that they are inconsistent with a contrary hypothesis.

5. **Taking Immaterial Issue from Jury.** It is not error to take from the jury an immaterial issue concerning which there is no sufficient evidence to sustain a verdict, even though there be a scintilla of evidence thereon which was admitted without objection.

ERROR from the district court for Douglas county. Tried below before SCOTT, J. *Affirmed.*

*John C. Cowin, Virgil O. Strickler* and *J. A. Williams,* for plaintiffs in error:

George H. Boggs died on June 1, 1895, in the city of Omaha. He left surviving a wife, Ida M. Boggs, but no children. The plaintiffs in error are brothers, sisters,

nieces and nephews of the testator. On the 19th day of June, 1895, the proponent (defendant herein) offered for probate in the county court of Douglas county an instrument purporting to be the last will of said George H. Boggs, executed May 16, 1895. The matter was taken to the district court on appeal. The trial resulted in a verdict for proponent. The trial judge refused to hear argument on the motion for a new trial. The objectors bring the cause to this court for review. The objections to the proposed will were:

1. That it was made by Mr. Boggs at a time when he was so weakened and enfeebled by disease that he was mentally incapable of executing a valid will;

2. That the instrument was not in accord with his declared intention, made when he was in health, on repeated occasions as to the manner in which he intended to dispose of his property;

3. That Ida M. Boggs and her mother and father conspired with each other, and with divers other persons for the purpose of procuring the execution by Mr. Boggs of the will in question, so that Ida M. Boggs might obtain all of his property.

The evidence discloses that about the year 1870, George H. Boggs and his friend Lew W. Hill, both being young men and very poor, formed a partnership, and engaged in the real estate business in the city of Omaha. They both possessed more than ordinary business ability. The partnership continued for twenty-five years; and when they came to divide their property shortly before Mr. Boggs' death, it was found that each had accumulated about $400,-000. The evidence discloses that for fifteen years prior to his death, George H. Boggs declared it to be his intention to bequeath one-half of his property to his wife and one-half to his brothers and sisters. It further appears that in 1886, when Mr. Boggs was in health, he wrote a will in his own hand, and executed it in the presence of his partner, Lew Hill, and his private secretary, Harry Westerfield, in which he bequeathed one-half of his property to

his wife and the remainder to his brothers and sisters. On the first day of March, 1893, just before Mr. Boggs went to the depot to leave Omaha, under medical advice, Mr. Connell went to the house with a typewritten will, which Mr. Boggs signed and immediately delivered to Mrs. Boggs. On the 16th day of May, twelve days after his return, Mr. Boggs executed the will in controversy. This was sixteen days before his death. The disease invaded the larynx and was eating out the vocal chords. He was scarcely able to utter an audible sound. The question then naturally arises as to why the will offered for probate was executed at all, since Mrs. Boggs already had in her possession one exactly like it, executed two years before. It is very easy to answer this inquiry. In these two years Mr. Boggs had been able to be about his office some. Mrs. Boggs had been desperately afraid that he had executed a will in accord with his declared intention. He had come back to Omaha to die. The first thing she did on her return to Omaha was to let her own mother and father come to her house, where they remained till after the will was executed, and then went to their own home in another part of the city. None of the brothers and sisters of George H. Boggs were permitted to see him in Omaha till after the will was executed.

Conspiracy is generally proved by circumstances. Although the common design is the essence of the charge, it is not necessary to prove that the defendants came together and actually agreed, in terms, to have that design and to pursue it by common means. *Spies v. People*, 122 Ill., 1, 12 N. E. Rep., 865; 3 Greenleaf, Evidence, 83; *Mussel Slough Case*, 5 Fed. Rep., 680; *Sucker v. Finch*, 66 Wis., 17; Wharton, Criminal Law, 1398; Bishop, Criminal Procedure, 227.

*Connell & Ives, contra:*

That the testator, when he executed this will, was in the full and unimpaired enjoyment of every mental faculty can not be the subject of serious controversy. We have not

the slightest inclination to deny the promises made by the proponent to the testator at the time the will was executed. She said she would carry out his wishes as to caring for his relatives. What those wishes were, has now become wholly immaterial. Without exception they have repudiated the provisions made for them by the testator. They rejected the promises almost as soon as known. They gave her no chance to redeem her words or to demonstrate her good faith.

Influence, to vitiate a will, must be such as to amount to force and coercion, destroying the free agency of a testator, and there must be proof that the will was obtained by this coercion; and it must be shown that the circumstances of its execution are inconsistent with any hypothesis but undue influence, which can not be presumed, but must be proved, and in conjunction with the will and not with other things. *Latham v. Schaal,* 25 Nebr., 535; *Seebrock v. Fedawa,* 30 Nebr., 437; *Bradford v. Vinton,* 26 N. W. Rep. [Mich.], 401.

All questions of fact were submitted to the jury. In a case of conflicting evidence, this court will not disturb the verdict. *Whitcomb v. Thomas,* 47 Nebr., 909; *Wakefield v. Connor,* 225; *Lungren v. Crum,* 242; *State v. Spirk,* 337; *Galligher v. Wolf,* 589; *Buffalo County Bank v. Gilcrist,* 897, all in the same volume.

Argued orally by *John C. Cowin* and *Virgil O. Stickler,* for plaintiff in error; by *W. J. Connell, contra.*

POUND, C.

This is a petition in error to review a judgment of the district court of Douglas county, admitting to probate an instrument propounded as the last will and testament of George H. Boggs, deceased. A large number of exceptions were taken during the course of the trial, and numerous errors are assigned in this court. But the briefs and argument have been confined to the assignment that the verdict and judgment are contrary to the evidence, and to

one based on an instruction given by the court on its own motion.    Three objections were made to the will, to the effect that the testator, at the time of its execution, was so weakened by disease that he was mentally incapable of executing a valid will; that the will propounded was not in accordance with his intentions, repeatedly declared when he was in health; and that it was procured through undue influence of the proponent, his wife, and conspiracy of the proponent and her father and mother to that end in order that she might obtain all the property.    The principal contention of the contestants is that the will was procured by undue influence of Mrs. Boggs, at a time when her husband was greatly weakened by disease and substantially incapable of resistance, and, to pass upon this question, it has been necessary to review a very voluminous record in which all the testimony taken at a trial lasting nearly two weeks is set forth at large.

From the evidence it appears that George H. Boggs was the youngest of a family of ten, of whom three brothers and five sisters, the youngest about fifty and the oldest about seventy, were surviving at his death.    These brothers and sisters, and the children of a deceased sister, are the contestants.    George Boggs came to Omaha about 1866, and for many years was a mail clerk at a small salary.    In 1872 he married the proponent, with whom he lived in Omaha until his death.    At the time of his marriage he had saved about a thousand dollars, but afterwards he lost his position as a mail clerk, and, during the earlier years of his married life, was in poor circumstances, his wife doing her own housework for some five years.    He seems to have been a business man of no little ability, and by fortunate investments, industry and saving, in which on one occasion, at least, he acknowledged that his wife was in part instrumental, he succeeded in the course of ten or fifteen years in amassing a fortune estimated at close to half a million.    In 1886, when his fortune was at its maximum, he made a will, in which he left one-half of his estate absolutely to his wife, and the remainder, there being no chil-

Boggs v. Boggs.

dren, subject to $2,000, to his father, to his brothers and sisters equally. At about this time, and for several years immediately thereafter, he repeatedly told his brothers and sisters that it was his intention to leave them half of his property, and there can be no doubt that such was long his intention. But several events operated to alter his plans. His father died in 1891; in 1892 a period of financial depression set in, as a result of which his property shrank in value about one-half; and, somewhere about the end of 1892, it became apparent that he was affected with an incurable disease. At the time of his death he had tuberculosis of the larynx, his lungs were greatly affected, and he had a tuberculous sore upon his hand. There is some conflict in the medical testimony as to whether the disease began in his throat and worked downward or *vice versa.* At any rate it first became such as to create alarm about the end of 1892, and one physician testified that in 1894 his lungs were in fairly good condition and that apparently he then had only tuberculosis in the throat, though it was spreading downward. There is no doubt that in 1893 he was in every way in full mental vigor and that his will was not impaired at that time. But it would seem that he had expected that his wife would receive about $250,000 under his first will, and the great shrinkage in values, the death of his father, and the fact that he was compelled to leave the state for his health, evidently moved him to make a new will which would conform to his intentions with respect to his wife in view of altered conditions. Accordingly on March 1, 1893, he made a new will whereby he gave his home property, all his personal estate and one-half of the residue of his real estate to Mrs. Boggs absolutely, and the other half to his secretary in trust to pay the income thereof, or such part as she should require, to his wife during her life, and at her death to divide it, or such part as should remain and any accumulations of income, among his brothers and sisters. It also provided that upon the written request of his wife, the trustee should sell any of the property she might designate and otherwise invest the

proceeds, and gave her power to remove the trustee and appoint another and to fill any vacancy. This will was drawn by Mr. Connell, who had long been his attorney, and was witnessed by Mr. Connell and Mr. W. S. Poppleton, who happened to be at the house that day for the purpose of taking Mr. Boggs' deposition. It does not appear that Mrs. Boggs had anything to do with suggesting or procuring this will or any of its terms. She was not present when its terms were settled, when Mr. Boggs and Mr. Connell went over the draft, nor when it was executed. She testifies that she was busy packing his trunk at the time, and that when he came to her with the draft of the will just before he signed it and wanted her to read it, she told him that she was busy and that any way he wanted it would suit her. There is nothing to throw any suspicion upon this will, except that it does not do so well by his brothers and sisters as he had originally intended and that he continued to tell the latter that on his death they would be well provided for. But many circumstances indicate that he was solicitous that after his death his wife should live as she had for many years since he had acquired wealth, and that, while he wished to do what he might for his brothers and sisters, his first care was that his wife should have as near as might be all that would insure her complete independence and enable her to do everything that she desired. Hence he not only considerably increased the absolute gifts to her, but he provided also that the entire income of his estate should be at her disposal during her life, should she require it. From that date his health appears to have declined gradually with the progress of his disease, until early in 1895 he had partially lost the use of his vocal chords, had become weak and emaciated, and was substantially confined to his room. About this time he went to Chicago for treatment; but finding no relief, he returned to Omaha about the first of May, and died on the first of June. On May 16 he made the will in question. With respect to his mental capacity on that date there can be no serious question. The physicians wl ⟩ attended him, a

clergyman who called upon him regularly during his last days, the lawyer who took his instructions for and drew the will, and a member of the bar who called upon him four days before he died, concur in the statement that he was bright and clear mentally down to a day or two before death, and there is evidence that he gave intelligent and detailed directions as to the conduct of his business down to the last. One of the physicians testified, and it is a well known fact, that a tuberculous disease produces great weakness physically but not much mentally, and that consumptives are usually bright mentally to the end.

With respect to the claim that the will was procured to be made by undue influence on the part of Mrs. Boggs, it is to be observed, in the first place, that the testator was a man of unusual force and strength of will. All who came in contact with him, even the physicians who treated him in his last illness, remarked this, and at every turn in the record we see him positive, confident, and giving clear directions about his business in the manner of one who expects to be obeyed. It is true some of the contestants testify that he was accustomed to yield to his wife and even that he stood in some fear of her displeasure. But there is ample ground for thinking that this sprang from affection solely. It is not unlikely that both, having won their way in the world by industry and saving from comparative poverty, were self-reliant and determined. Nothing appears to indicate that a man as obstinate and pertinacious as he seems to have been was under the dominion of his wife's will, even when enfeebled by incurable disease. It is undoubtedly true that physical weakness more or less enfeebles the will. But it is in evidence that there was no observable waning of his mental powers till a day or two before he died, and the physician who attended him at the time the will was executed says that on that date he was just as able to resist importunity and entreaty as when well. In the next place, the evidence shows that Mrs. Boggs took no immediate part in the making of this will. She was not present when the testator gave the instruc-

tions for drawing it, when the draft was gone over by the testator and his lawyer, nor when the final draft was afterwards read over preparatory to execution. It appears that after he returned from Chicago, Mr. Boggs called for his will. He read it over and said he was going to make a new one. He sent for his secretary, gave him a memorandum of specific property which he desired to have given to his wife absolutely, and had Mr. Connell sent for. Mr. Connell had been his attorney for twenty years. They talked the matter over fully in the absence of Mrs. Boggs and no reason appears why the testator should not have revealed his true intentions completely. Mr. Connell had never talked with Mrs. Boggs about it, and there is no indication that she interfered in any way. The notes for the will were taken down from the testator's own direction. The next day the draft was gone over with him paragraph by paragraph, and in the evening the new and final draft, corrected to meet his views, was again read over, first by paragraphs and then as a whole. He expressed himself as satisfied, got up, walked across the room, and signed it. Earlier in the day he asked one of his physicians to come to the house that evening and witness the will. In every step we see him the principal actor, and his wife has no part. Counsel have criticised the lawyer who drew the will for opposing or advising against some suggestions offered by the testator as to the terms of the trust. But we think it was his duty to tell the testator whatever his experience and knowledge of the law suggested as appropriate; and if some course proposed by the testator appeared impracticable or unwise, he was retained to say so, and his so doing is no indication of undue influence or conspiracy.

Again, it is to be noticed that the will in question and the will of 1893 are not essentially different. In the former will, Mrs. Boggs was given the home, all the personalty, and one-half of the residue of the realty. In the last one, she was given certain specific realty instead of an undivided one-half. The testimony shows that Mr. Boggs was not hopeful of a speedy revival of business and recovery

of values. He evidently wished to give the improved and productive property to his wife, and he told his secretary and his lawyer that his object in making the new will was to give her specific property in lieu of one half generally. Under the new will the property given to her absolutely was in fact somewhat less than that given by the former will. A similar case was presented in *Seebrock v. Fedawa,* 30 Nebr., 424, 443, and the fact that the prior will was more favorable to the proponent was considered a strong circumstance.

It was attempted to show that Mrs. Boggs systematically prevented the testator's relatives from talking with him in private and that she endeavored to keep them away from him. Many occurrences which appear in evidence might be given such construction. But they are all equally compatible with an honest and sincere solicitude for his welfare and the demands of caring for one in his condition. She took care of him substantially unaided. He required constant attention by day, and she had to get up during the night at stated intervals and administer certain remedies. He was inclined to be talkative and to exhaust himself in conversation, and his physicians had to caution repeatedly against permitting him so to do. Under such circumstances, constant presence at his side and jealous watchfulness lest he talk too much or become unduly excited were in nowise reprehensible.

Some statements are testified to by the contestants as having been made to them by the testator after the will was executed to the effect that he would have liked to do better for them, but that his wife would not let him. Were it not for the prior will of 1893, these statements might not be without weight. But he was not coerced two years before, or, if he was, had had ample time to retract, and we do not think these statements should outweigh his deliberate acts. Moreover, his statement to Mr. Hill, his former partner, that he had made a will, but did not know whether he had done the right thing or not, is suggestive. He had asked his wife, and she had agreed, to give whatever of the in-

come she did not need or use to his relatives, for whom he made no immediate provision, and had also asked her to make a will in their favor. As his lawyer told him at the time, this left it to her honor so to do. He was anxious to leave his wife secure in all that she had been accustomed to. He also wished to do something for his relatives. That he had some doubt even after he made the will as to how far his solution of the conflicting claims upon him was the best one, does not indicate that the solution he adopted was not his own. Counsel say that Mrs. Boggs has done nothing in the way of carrying out these wishes of her husband. But the pendency of this contest has doubtless precluded any action, and we are loth to think that the confidence which he reposed was misplaced. There is nothing to show that she did not fully intend to do all that he asked and that she assented to.

Where undue influence is charged, the question is, in substance, whether or not the testator acted freely and upon his own judgment or under some species of coercion or imposition. In one of the leading cases, Lord Cranworth said: "It is extremely difficult to state in the abstract what acts will constitute undue influence in questions of this nature. It is sufficient to say that, allowing a fair latitude of construction, they must range themselves under one or the other of these heads,—coercion or fraud." *Boyse v. Rossborough,* 6 H. L. Cas. [Eng.], *2, *48. In other words, in the absence of fraud and imposition, undue influence, in order to invalidate a will, must amount at least to a moral coercion; it must be of such character as to destroy the free agency of the testator and substitute another person's will for his own. *Latham v. Schaal,* 25 Nebr., 535. Such moral coercion may consist in constant pressure of importunity or persuasion, whereby the mind of the testator is not left free to act understandingly. But in such case, there must be such a degree of urgent solicitation that, under the circumstances, and considering the testator's condition of mind and body, he was too weak to resist it, and acted under constraint of

fear, desire for peace, or some motive other than affection or an intelligent sense of duty, contrary to his real intention. Persuasion of persons *in extremis* is looked upon with disfavor. But in this case the testator was not in that condition. It was then thought that he might live for some time, and one of the physicians says he had a chance to hold out several months. He was able to do business at least ten days afterwards, and fully understood his affairs in all their details. He was by no means so feeble that he could not have resisted a very considerable amount of importunity or solicitation had he been subjected thereto. Undoubtedly, as a general rule, confidential relations may raise strong suspicion of undue influence. But this is not true to the same extent of the relation of husband and wife where, as here, the relation has subsisted for a long time under circumstances which give rise to a very strong legitimate influence, and the disposition in question is not unjust or unnatural. Mrs. Boggs had shared his poverty, and her thrift and saving had contributed to his rise. She had faithfully and zealously attended him in his long illness, and there can be no doubt that he held her in great and well-deserved affection. No presumption of undue influence can be drawn from such facts. It can not be denied that proof of undue influence must usually be circumstantial, and that there are many circumstances in the record which are consistent with a uniform course of importunity and of exclusion of the testator's relatives from his presence. But they are equally consistent with zealous attention to the duties that devolved upon the proponent as his wife, and there is no direct evidence of such importunity. In the leading case already quoted from, Lord Cranworth said: "It is not sufficient to show that the circumstances attending its execution are consistent with the hypothesis of its having been obtained by undue influence; it must be shown that they are inconsistent with a contrary hypothesis"; and this statement of the rule has been universally accepted and has been approved by this court. *Latham v. Schaal*, 25 Nebr., 535. The contestants'

case falls far short of this, and hence we think the conclusion of the jury was entirely correct.

The instructions given by the court on its own motion fully and correctly present the law as to undue influence and testamentary capacity. Possibly they may be open to some criticism, as suggested by counsel, by reason of undue length and a tendency to argumentativeness. But no specific objections are urged upon us except as to one instruction, nor do we perceive any prejudicial error in the charge as a whole. In one instruction the court told the jury that there was no sufficient evidence of a conspiracy on the part of the proponent and her father and mother for the purpose of influencing the will of the testator. We do not think this instruction prejudically erroneous for two reasons. In the first place, the real issue was not whether there was a conspiracy as charged, but whether the will had been procured by undue influence on the part of Ida M. Boggs, singly or in conjunction with others. The court clearly and repeatedly pointed out that such fact, if established, would vitiate the will, and having that question definitely before them, we do not think the jury were confused by having the immaterial issue of conspiracy taken out of their hands. If such conspiracy existed, it would not of itself be ground for setting aside the will, but the facts indicating it might bear upon the issue as to undue influence. In the second place, there was no sufficient evidence to sustain a finding of conspiracy. Aside from a remark of the testator to one of the contestants, which, at most, only shows that he suspected her parents of some scheme, every circumstance urged upon our attention as evidence of conspiracy is entirely susceptible of an honest construction. Mrs. Boggs's parents stayed at the house a short time after the return from Chicago, at a time when she was devoting her whole time to the care of her husband and was in sore need of assistance. Some days after the will was made, one of Mr. Boggs's sisters came; presently others of his relatives arrived, and Mrs. Boggs's parents withdrew. At one time her mother suggested that so many

people in the house was bad for the testator, whose tend-ency to overexertion in conversation gave great anxiety. Thereupon Mrs. Boggs said that she and one of her hus-band's sisters could take care of him sufficiently, and, as he might live for some time to come, there was no need that all of them remain. Mrs. Boggs positively denies any conspiracy, and, bearing in mind the strain she was under at the time, we do not think that the circumstances re-ferred to would warrant a finding that there was one. Counsel say that the evidence in question was admitted without objection. Neither that fact nor a possible scin-tilla of evidence as to some scheme, required submission of an immaterial issue to the jury.

It is recommended that the judgment be affirmed.

SEDGWICK and OLDHAM, CC., concur.

By the Court: For the reasons stated in the foregoing opinion the judgment of the district court is

AFFIRMED.