IN RE ESTATE OF OSCAR R. THOMPSON, DECEASED. PEARL RAY THOMPSON, APPELLEE, V. MARTIN THOMPSON ET AL., APPELLANTS.

44 N. W. 2d 814

Filed December 8, 1950. No. 32817.

*Spear, Lamme & Flory,* and *H. M. Nicholson,* for appellants.

*Davis, Stubbs & Healey,* and *Sidner, Lee & Gunderson,* for appellee.

Heard before SIMMONS, C. J., CARTER, MESSMORE, YEAGER, CHAPPELL, WENKE, and BOSLAUGH, JJ.

SIMMONS, C. J.

This is a will contest. The issue was undue influence. Trial was had to a jury, resulting in a verdict for the proponent. The trial court entered judgment that the instrument was the last will and testament of testator. Contestants appeal. We affirm the judgment of the trial court.

The proponent of the will is the widow of Oscar R. Thompson, deceased, who died in 1949. She will be referred to hereinafter as proponent; he, as testator. The contestants are three brothers and several nieces and nephews of the testator. They will be referred to herein as contestants, except where more particular reference is necessary.

There is very little actual fact dispute in this record. Where it exists materially it will be mentioned.

The testator was born in Norway. He came to this country prior to or during the year 1869 with his parents and two older brothers. The father homesteaded near Wisner, Nebraska, where two brothers and two sisters were born. The father died in 1885. Two of the brothers had left the home prior to that time. The mother and the others continued to live on the homestead for a time. The mother moved to Wisner in 1897, where she died in 1904. Beginning about 1895, the testator and his brother Thomas operated the farm as a partnership. It appears that there was no settling of the father's estate or of the mother's estate immediately following their deaths. In 1907, testator and Thomas settled with the other members of the family and became the owners of the farm and personal property. They purchased other lands, and operated a general farming and livestock raising and feeding business. They closed out the direct operations in 1943, and thereafter continued to own and operate the farms as a partnership until testator's death.

The testator was married in 1900 and made his home on the homestead. Thomas was married in 1904 and established a home in Wisner, going to the farm each day. Testator largely handled the business operations while Thomas worked directly on the farming operations.

There appears to have been no discord between the two brothers or, for that matter, with the entire family, so far as testator is concerned, with exceptions to be hereafter noted.

Testator's first wife died in 1938. There were no children born to this union. Thereafter testator made a will leaving his entire estate to his brother Lewis, one of the contestants. During all this period Lewis operated a jewelry store in Wisner. At least during the latter years testator had a desk at his brother's place of business where he fairly regularly went to transact

business. It appears then that as early as 1938 or 1939, testator had determined that his relatives, Lewis excepted, would not be beneficiaries of his will.

We find in this evidence no facts upon which it can be successfully contended that any of the contestants contributed materially to the accumulation of testator's estate, and none upon which it can be urged that any of them had a particular reason, other than relationship, to be the beneficiaries of his will.

In October 1941, testator married the proponent. In 1943, he had a surgical operation to remove one leg, later a second operation was had to remove the other leg, and he was compelled to use a wheel chair in getting about.

The will involved here was made the day prior to the first operation. After provisions for payment of debts and other expenses, the will made proponent the sole beneficiary of testator's estate and appointed her as executrix. The will was offered for probate and this contest followed.

At the conclusion of contestants' case-in-chief and again at the close of all the evidence, proponent moved for a directed verdict on the ground that contestants had failed to establish undue influence. The motions were overruled. The case was submitted to the jury with the result of a verdict for proponent.

Contestants assign error based on (1) the refusal of the trial court to declare a mistrial because of opening statements to the jury made by proponent's counsel; (2) the admission of evidence of the proponent as to declarations made by testator subsequent to the execution of the will; (3) the admission of evidence of the physical incapacity of testator subsequent to the will and his dependence on the proponent; (4) the giving of one instruction and the refusal to give a requested instruction; and (5) the admission of evidence offered by proponent after contestants had rested.

The proponent here contends first that there was not

sufficient evidence to take this case to the jury on the issue of undue influence, and hence the errors assigned are immaterial. Secondly, she contests the alleged errors in any event.

The rule in this state is: "In a will contest on the ground of undue influence the burden is on the contestant to prove by a preponderance of the evidence (1) that the testator was a person who would be subject to such influence, (2) that there was opportunity to exercise such influence, (3) that there was a disposition to exercise such influence, and (4) that the result was the effect of such influence." In re Estate of Farr, 150 Neb. 615, 35 N. W. 2d 489. Proponent directs attention to elements (1) and (4) of the above rule.

"In order to invalidate a will, undue influence must be of such a character as to destroy the free agency of the testator and substitute another person's will for his own." In re Estate of Heineman, 144 Neb. 442, 13 N. W. 2d 569. See, also, In re Estate of Goist, 146 Neb. 1, 18 N. W. 2d 513.

"Undue influence cannot be inferred alone from motive or opportunity. There must be some evidence, direct or circumstantial, to show that undue influence not only existed, but that it was exercised at the very time the will was executed." In re Estate of Heineman, *supra*.

We consider first the question of the sufficiency of the evidence. We review the evidence in the light of the rule that "A motion of proponents on the trial of a will contest made at the close of the evidence of the contestants to withdraw from consideration of the jury the issue of undue influence admits the truth of all material and relevant evidence submitted by the contestants, and they are entitled to have it and all inferences fairly deducible therefrom viewed in the most favorable light in testing the correctness of the ruling of the court granting the motion." In re Estate of Bainbridge, 151 Neb. 142, 36 N. W. 2d 625.

We recognized in the Bainbridge case that "In evaluating the testimony and proper inferences therefrom, it is not always possible to apply the evidence tending to establish improper influence which is referable to the will solely to one of the essential elements. * * * It is permissible therefore not to strive to separate each fact supported by evidence offered as proof of undue influence and allocate it under one or more of the four essential elements requisite to establish the exercise of undue influence, but to view the entire evidence offered by the contestants as proof of this issue and rest the decision upon whether or not the evidence as a whole is of such a substantial nature as to contain some proof of each of the essential elements, and to require that the issue of undue influence be submitted to and determined by a jury." In re Estate of Bainbridge, *supra*.

Proponent, when she married testator, was the widow of J. I. Ray. She was Mr. Ray's second wife. Mr. Ray and proponent were teachers. The Rays and testator and his first wife first met when Mr. Ray was teaching at Wisner in 1919. The two families became friends and were often at each other's homes. Mr. Ray became county superintendent of schools in Dodge County. He became ill in 1936 and died in 1937. Mrs. Ray was appointed to that position and at the end of the term was elected to that office. Her service was completed in January 1943. Mrs. Ray, together with her sister and a lady friend, attended the funeral of the first wife of testator and on that occasion kissed him in the presence of relatives and friends. Thereafter on Memorial Day testator called on proponent in Fremont. He called upon her on other occasions. On occasion she called on him at his farm. The marriage followed. After the marriage Mrs. Ray concluded her term as county superintendent with testator's approval. Testator spent most of his time at the home on the farm; she, in Fremont. They were together when events permitted. When her term ended in January 1943, they made their home at

the farm, and later removed to Fremont where they lived together until testator's death. They lived and worked together. So far as appears in this record, their relations were congenial and harmonious throughout.

Testator was a man of many activities. He conducted an insurance business, made appraisals, and adjusted losses at different times. He was a member of the county board and of the fair board, an active member of a cooperative farmers' union, active in his political party and on one occasion a delegate to its national convention. He was selected as a Master Farmer; he was active in his lodge. He was president of and a principal stockholder in a telephone company, which seems to have been largely a family-owned corporation. It is shown by evidence admitted without objection, mostly in that of the contestants' case, that in all these activities he was a leader, a dominating personality, strong willed, determined to have his way, and when denied it, he had a resentment directed to those who opposed him.

Three illustrations appear in the evidence of contestants. In 1907, when the family settlement was made, testator fixed the amount to be paid to the others and on a take-it-or-leave-it basis. On one occasion his brother, a director of the telephone company, proposed an increase in wages to its employees. It does not appear that it had been discussed with testator beforehand. Testator, as presiding officer, refused to put the motion. Another director put the motion and it was carried. Bitter words were said and finger shaking at least indulged in. Testator resented it. During the period he was a widower he transferred $5,000 in telephone stock to his brother Lewis and other stock to a nephew. In 1946, testator asked his brother to return the stock. The brother refused and testified that thereafter the testator evidenced a coldness to him and did not speak to him in greeting, although testator continued to go to this brother's store and use the desk as had been his custom.

There is no evidence of any ill will or coldness toward proponent.

There is evidence that the testator was subject to flattery. However, there is no evidence anyone ever persuaded him by that means and none that proponent ever flattered him or undertook to do so.

The evidence all points directly to only one conclusion and that is that testator was not a person who would be subject to undue influence.

We go now to the evidence with reference to the making of the will. Testator became ill in 1942 with Buerger's disease. He was hospitalized for some time and the disease responded to treatment. He again was hospitalized in the spring of 1943. His physician advised testator that he would have to have the afflicted leg removed. Proponent was so informed. On July 27, 1943, with the doctor's permission, testator was allowed to leave the hospital at West Point and go to Wisner to take care of business matters. He had lunch and at 12 noon left the hospital for Wisner. He was on crutches. He and proponent went there by car, she driving. It does not appear when they arrived at Wisner. On reaching there he went into his brother's store where he remained for some time. Proponent went to visit one of the testator's sisters-in-law and told her and her family of the contemplated operation which was to be made the following day. She had lunch there. She returned to the store. Testator and proponent then returned to West Point, went to the office of John Gross, a lawyer, where the will was made, and then returned to the hospital at 3:45 p. m.

Either before they left Wisner or on the return trip to West Point, proponent testified that she asked the testator if he had taken care of everything and he answered, " 'Yes, Louie is my heir'." Proponent said, " 'Is that the way you want it?' " Testator said, " 'No'." Nothing was said further and in a short time testator said, " 'Drive me to John Gross's office'." That was

done. Mr. Gross was in. He had been testator's lawyer prior thereto. Testator asked to go into his private office. Proponent accompanied him. Testator told Mr. Gross he wanted to make a will and told him who his relatives were. He was asked to list his property, and in reply said that he wanted to leave it all to his wife. The will was so dictated in proponent's presence. She took no part in the conversation. Testator suggested an old friend as a witness. Mr. Gross called him. He came and visited with testator. Testator read the will. The friend and Mr. Gross signed as witnesses, using the usual witness recitals. The will then was placed in an envelope, sealed, endorsed as to its contents, and delivered to the testator. It remained in his possession until 1947, when testator handed it to proponent with other papers to be placed in a bank for safekeeping.

There was a variance in the evidence as to the conversation at Wisner. A niece of testator, one of the contestants, testified that early in April 1949, she and her husband visited testator at the hospital. Proponent was there. The three then went to the Thompson home and had a friendly visit for an hour or two. Proponent brought up the matter of testator's will. The niece testified as follows: "Well, she said that on several occasions that uncle Oscar Thompson had told her that if she ever needed money to go to Louis (Lewis) Thompson and she said that this day they were sitting out in their car in front or across from Martin's store at Wisner when he again made the remark that if she needed money to go to uncle Louis (Lewis) Thompson and she said she said to him—Just what do you mean by that. And he said that I have made a will and left all my money to Louis (Lewis) and she said to him—Well, we will do something about this right now—and she said I took him to an attorney and he left it all to her." The niece's husband testified that it was "exactly" as his wife related it, and that "We were talking and, I don't know, the conversation got around to relatives which it gen-

erally does and one thing led to another and out of the clear sky this remark about various things Oscar had mentioned, if she ever needed help or money to go to his brother Louis (Lewis) and this particular day that she mentioned, Oscar had been transacting some business in Wisner and was there in the store and the car was outside and after they had wheeled him out and he had got back in the car and they had that conversation before they started out and he repeated this statement about if you ever need any help or money. Well, she said, just what do you mean by that. And he answered —that he had made a will sometime back and left it all to his brother Louie (Lewis), so she said—Well, we will do something about that right now. She said—I drove him to an attorney and he made a will leaving it all to me or words to that affect (sic)."

Putting these two stories together, as appears necessary in order to fix the time about which the niece and husband testified, we have this as a result. Testator was a man of advanced years; he had considerable property; he was faced with a serious operation; he went to Wisner to transact business that he deemed needed attention. He did that without the presence of the wife. When she returned, she asked if he had transacted all the business he desired; he said he had. She asked him what she was to do if she needed money; he told her to go to his brother Lewis, and that he had left his property to Lewis. Proponent asked if that was the way he wanted it; he said it was not. She said "we" will do something about that now. "We" drove to West Point and at testator's direction to his lawyer's office. We find no evidence that proponent asked, urged, or demanded that she be made the beneficiary of the will. It was not mentioned. So far as this record discloses, proponent did not know that she was to be the beneficiary of the will in whole or in part until the testator directed Mr. Gross to so provide.

Putting aside proponent's testimony, we are left with the two statements of the niece and the husband. Do they

show sufficient facts to take this case to the jury on the issue of undue influence? At best the statements show only a determination on the part of the wife that her husband have a will before the operation that met his wishes, and likewise a determination that she be not compelled to go to a brother-in-law for money when and as she needed it. It shows nothing more than a disposition to exercise an influence.

We held in the case of In re Estate of Bainbridge, *supra,* that "The evidence must tend to show undue influence directly in reference to the will in question, and be of such a nature as to control the will of the testator and cause him to do something that he did not intend. Suspicion or supposition of undue influence is not sufficient to require the submission of the question to a jury or to sustain a verdict."

The Supreme Judicial Court of Massachusetts in Neill v. Brackett, 234 Mass. 367, 126 N. E. 93, held that "There may be influences directing the will-maker's attention to proper obligations which it might be thought ought to be satisfied by testamentary provisions. Such influences may be persuasive and effective, but, so long as not coercive, they are not undue. Circumstances often arise where such conduct is wholly justifiable. The mere opportunity of the wife, when living happily with the husband, to influence the execution of a will favorable to herself, or to cause discrimination against or amongst children, is not alone sufficient to warrant submission to the jury of the question of undue influence. Mere suspicion, surmise or conjecture are not enough to warrant a finding of undue influence. There must be a solid foundation of established facts upon which to rest an inference of its existence. This proposition applies with peculiar force when the result of drawing such an inference is to destroy the effect of a written instrument prepared with deliberation and signed and attested with all the formalities required by law for the execution of a will."

In McMackin v. McMackin, 283 Mass. 452, 186 N. E. 500, that court made a specific application of this rule in a case where the testator was, as here, shown to have been a normal person of dominating type with a strong mind and not easily susceptible to improper influence. The court there held that "With a person so endowed the evidence of undue influence should rest upon a foundation of solid fact and not upon mere speculation to warrant the submission of the issue of undue influence to a jury."

In Boggs v. Boggs, 62 Neb. 274, 87 N. W. 39, we had a case in many respects remarkably similar to this one. There, as here, the proponent was a wife; the contestants, brothers and sisters, nieces and nephews. There, as here, the testator was a man of unusual force and strength of will. There, as here, nothing appeared to indicate that a man so minded was under the dominion of his wife's will. There we held: "Although in general confidential relations may raise strong suspicion of undue influence, this is not true to the same extent of the relation of husband and wife, where the relation has subsisted for a long time under circumstances which give rise to a strong legitimate influence and the disposition in question is not unjust or unnatural."

In Carter v. Gahagan, 102 Neb. 404, 167 N. W. 412, the beneficiary accompanied the testatrix to the office of the lawyer who drew the will, but was not present while the testatrix conferred with the lawyer. The beneficiary was present when the will was dictated and read to testatrix. The beneficiary took no part in the conversation. Without specific reference to this situation, we held that the judgment for contestants based on undue influence was not supported by the evidence.

In Hann v. Hann, 202 Iowa 807, 211 N. W. 495, a son contested a will whereby his father was made a substantial beneficiary. There the father called a lawyer to the home to draw the will and was present when it was executed. There, as here, there was no evidence

that the father had anything to do with the preparation of the will or in any way dictated its terms and provisions. The "principal point" in the contest on undue influence was the presence in the room of the beneficiary when the will was drawn. The court held that the presence of the husband and beneficiary did "not bear very much significance."

Here there is a suggestion in the evidence that the proponent did the courting and was seeking the marriage. In Berry v. Moore, 220 Ky. 619, 295 S. W. 885, that court dealt with a case where the record showed very vaguely that the wife "sort of engineered the marriage." She was a second wife, married a year before the will was drawn. The contestants were collateral heirs. The parties lived very happily after the marriage. The court held that the fact that she engineered the marriage, if she did, did not tend to show any undue influence practiced a year afterward when the will was written.

Cook v. Morton, 241 Ala. 188, 1 So. 2d 890, was a case involving a will contest wherein property was left to a second wife. A daughter by the first marriage contested the will. The testator was a man of positive character and decision in his personal affairs, and did "not brook dictation in such matters." The beneficiary called the draftsman to the hospital. She was there. The evidence tended to show a conference between the husband and wife in preparing notes for the draftsman. The evidence disclosed no effort on her part to shape the terms of the will. It was held not to be evidence of undue influence per se.

Burdon v. Burdon's Administratrix, 225 Ky. 480, 9 S. W. 2d 220, was a will contest. The proponent was the wife; the contestant, the mother of testator. The issue was undue influence. The court held: "It has been often held by this court that it is not sufficient to authorize the trial court to submit the question of undue influence to a jury when the evidence merely establishes

that there was an opportunity to exercise such influence. It must not only be established by the evidence that there was an opportunity to exercise undue influence, but, in addition thereto, there must be testimony which shows facts and circumstances from which the jury would be authorized to infer that it was in truth exercised. * * * If establishment of opportunity to exercise undue influence should be held sufficient to authorize the court to submit that question to a jury, any person contesting the will of a husband who had left his property to his wife would always be assured of having his case submitted to the jury. A man's wife, if any one, should always be in a position to exercise influence over him. * * * It ought not to be said that it is unfair and unjust for a man to make provisions for the care and comfort of his wife above all others when he realizes that he is about to take his departure, and will no longer be able to give her the shelter and protection which he promised her at the altar."

In a will contest on the ground of undue influence, if the evidence is insufficient to sustain a verdict upon that issue in favor of the contestants, then the trial court should direct a verdict. In re Estate of Scoville, 149 Neb. 415, 31 N. W. 2d 284.

We find no evidence in this record sufficient to justify submission of the issue of undue influence to the jury. It follows that the trial court erred in not sustaining proponent's motions for a directed verdict. It follows also that the alleged errors about which contestants complain are immaterial matters.

The judgment of the trial court is affirmed.

AFFIRMED.