IN RE ESTATE OF MARIE MARUSKA, DECEASED.
MILDRED HORTON ET AL., APPELLANTS, v. JERRY MARUSKA
ET AL., APPELLEES.
64 N. W. 2d 734

Filed May 28, 1954. No. 33502.

*Blackledge & Sidner,* for appellants.

*Clifford H. Phillips,* for appellees.

Heard before SIMMONS, C. J., CARTER, MESSMORE, YEAGER, CHAPPELL, WENKE, and BOSLAUGH, JJ.

WENKE, J.

This action arose as a result of Bessie Sperry and Jerry Maruska objecting to the allowance for probate of the last will of Marie Maruska, deceased, when offered for that purpose by Mildred and Melvin Horton, the latter being named executor therein.

The district court for Buffalo County submitted to a jury the issue of whether or not the will was the result of undue influence exercised over deceased by Mildred and Melvin Horton. The jury found that it had been so obtained and was not the true and valid will of the deceased. The proponents then filed a motion asking the court to set aside the verdict and grant them either a judgment notwithstanding the verdict or a new trial. This motion the court overruled and from its ruling this appeal was taken.

Appellants state the sole issue involved on appeal is, is the evidence sufficient to support a verdict of undue influence?

"Undue influence, in order to invalidate a will, must be of such character as to destroy the free agency of the testator and substitute another person's will for his own.

"The elements necessary to be established to warrant the rejection of a will on the ground of undue influence are: (1) That the testator was subject to such influence; (2) that the opportunity to exercise it existed; (3) that there was a disposition to exercise it; (4) that the result appears to be the effect of such influence." In re Estate of Johnston, 147 Neb. 886, 25 N. W. 2d 526.

"The burden of proof to establish undue influence is on the party so alleging. In re Estate of Hagan, 143

Neb. 459, 9 N. W. 2d 794; In re Estate of George, 144 Neb. 887, 15 N. W. 2d 80." In re Estate of Johnston, *supra.*

In considering the evidence adduced at the trial as to a certain issue, when proper motion is made for that purpose, the trial court should, in determining whether or not that issue should be withdrawn from the jury, apply thereto the following principle: If a motion for a directed verdict is made at the close of the plaintiff's evidence and again at the close of all the evidence, or in the alternative to dismiss plaintiff's case, to test the sufficiency of the evidence to support a verdict, it must be considered in the light most favorable to the plaintiff, that is, every controverted fact must be resolved in his favor and he should be given the benefit of every inference that can reasonably be deduced therefrom. See Dorn v. Sturges, 157 Neb. 491, 59 N. W. 2d 751.

In In re Estate of Thompson, 153 Neb. 375, 44 N. W. 2d 814, where the same issue was involved as here, we said: "A motion of proponents on the trial of a will contest made at the close of the evidence of the contestants to withdraw from consideration of the jury the issue of undue influence admits the truth of all material and relevant evidence submitted by the contestants, and they are entitled to have it and all inferences fairly deducible therefrom viewed in the most favorable light in testing the correctness of the ruling of the court granting the motion."

After so considering the evidence it is the duty of the trial court to determine the issue or issues upon which there is competent evidence and submit them, and only them, to the jury.

In a will contest on the ground of undue influence, if the evidence is insufficient to sustain a verdict upon such issue in favor of the contestants, then the trial court should withdraw that issue from the jury and, if that is the only issue, either direct a verdict or discharge the jury and render judgment for proponents.

See Nebraska Methodist Hospital v. McCloud, 155 Neb. 500, 52 N. W. 2d 325.

On the other hand, that question should be submitted to the jury when the facts and circumstances proved, together with inferences fairly deducible therefrom, are such that reasonable minds might conclude the will was not the free and voluntary act of testatrix, but the result of undue influence exercised upon her. See In re Estate of Strelow, 120 Neb. 242, 233 N. W. 889.

The same principles apply on appeal and, in applying them, we consider the evidence adduced in light of the following:

"In testing the sufficiency of evidence to support a verdict it must be considered in the light most favorable to the successful party, that is, every controverted fact must be resolved in his favor and he should have the benefit of every inference that can reasonably be deduced therefrom." Borcherding v. Eklund, 156 Neb. 196, 55 N. W. 2d 643.

In considering this issue we have, in regard thereto, stated:

"Undue influence cannot be inferred alone from motive or opportunity. There must be some evidence, direct or circumstantial, to show that undue influence not only existed, but that it was exercised at the very time the will was executed." In re Estate of Thompson, *supra.*

"There may be influences directing the will-maker's attention to proper obligations which it might be thought ought to be satisfied by testamentary provisions. Such influences may be persuasive and effective, but, so long as not coercive, they are not undue. Circumstances often arise where such conduct is wholly justifiable." In re Estate of Thompson, *supra.*

"Mere suspicion, surmise, or conjecture is not enough to warrant a finding of undue influence. There must be a solid foundation of established facts upon which to rest an inference of its existence." In re Estate of

Fehrenkamp, 154 Neb. 488, 48 N. W. 2d 421.

"Undue influence is usually surrounded by all possible secrecy. It is almost always difficult to prove by direct and positive proof. It is largely a matter of inferences from facts and circumstances surrounding the testator, his life, character, mental condition, as shown by the evidence, and opportunity afforded designing persons for the exercise of improper control." In re Estate of George, 144 Neb. 887, 15 N. W. 2d 80.

"In making proof of undue influence a contestant is not limited to the bare facts that he may be able to adduce, but he is entitled to all inferences that may be legitimately derived from established facts." In re Estate of George, *supra.*

"In evaluating the testimony and proper inferences therefrom, it is not always possible to apply the evidence tending to establish improper influence which is referable to the will solely to one of the essential elements. It is permissible therefore not to strive to separate each fact supported by evidence offered as proof of undue influence and allocate it under one or more of the four essential elements requisite to establish the exercise of undue influence, but to view the entire evidence offered by the contestants as proof of this issue and rest the decision upon whether or not the evidence as a whole is of such a substantial nature as to contain some proof of each of the essential elements, and to require that the issue of undue influence be submitted to and determined by a jury." In re Estate of Fehrenkamp, *supra.*

Marie Maruska died on June 24, 1951. She had come to this country in 1921 from Czechoslovakia. She spoke and understood only the Bohemian language, never having learned to read, write, speak, or understand the English language. Shortly after she arrived in this country she married Mr. Vencil Maruska who lived on a 160-acre farm he owned in Webster County located five miles north and one-half mile east of Red Cloud, Nebraska.

Mr. Maruska had previously been married. His first wife had died. Eight children were born to this first marriage. Three children were born to the second marriage. They are Bessie, a daughter, now Bessie Sperry; Mildred, a daughter, now Mildred Horton; and Jerry, a son. At the time of the trial, which was held on March 30 and 31, 1953, Bessie was 31 years of age, Mildred 29, and Jerry 26. Mildred is one of the proponents of her mother's will and an appellant. Bessie and Jerry are the contestants of their mother's will and appellees. The other proponent is Mildred's husband, Melvin.

The Maruskas lived on this farm from the time of their marriage in 1921 until the father died on February 1, 1948. When the father died this farm, which he then owned, passed to his wife, Marie, his son Jerry, and to Anton Maruska, a son of his first marriage. At the time of the father's death Jerry and Anton were both single and living at home. Shortly thereafter Anton married and moved out. Jerry, however, continued to live on the farm with his mother and during the year 1948 rented it from her on a crop-share basis, she having the life use thereof. In February 1949, Jerry married Donice Martinson and she came to live with him on the farm. Jerry made the same arrangements with his mother in regard to farming the land for 1949 as he had for 1948. The three of them lived in the farm home. By agreement Jerry's wife did the housework and his mother worked outside in the garden and took care of her chickens. The mother owned the chickens on the farm and also some of the cows. The evidence shows the mother enjoyed being outdoors and would rather work in a garden or take' care of chickens than do housework.

Jerry again rented the farm for 1950. However, the mother did not stay on the farm during that year but left it on the last Sunday in February 1950, and went to live with her daughter Bessie Sperry and her husband Thad. The Sperrys lived in Superior, Nebraska. She

only stayed with the Sperrys until June 18, 1950, although she had put in a garden and had planned to stay there at least a year. When she left the Hortons came and got her and took her to their home in Kearney. On this occasion she stayed with the Hortons only a short time. It was while she was staying with the Hortons on this occasion that the will being contested was drafted and executed. Sometime shortly thereafter the Hortons took her to Holbrook, Nebraska. She stayed at Holbrook the balance of the summer, living with her stepdaughter Mary Sgro. The mother apparently wanted to go there because she could live in a cabin or shack by herself and have plenty of land on which to raise a garden.

The mother returned to the Horton home about October 1, 1950, and lived with the Hortons through the winter. In April 1951, she again returned to Holbrook, the Hortons taking her, and it was there she died.

When her husband died he left a will but Mrs. Maruska elected not to take thereunder but elected to take under the statute. As a result she obtained the life use of the farm plus a one-fourth interest therein. Apparently Anton and Jerry were, under the terms of the father's will, each to receive a one-half interest in the farm. However, when the mother elected to take under the statute of descent, each became vested with a one-half interest in the remaining three-fourths. When Anton left the farm the mother purchased his interest therein so thereafter she owned a life estate therein plus five-eighths of the remainder.

On November 7, 1949, Jerry and his mother entered into a written lease on the farm for the crop year of 1950. This lease contained an option whereby Jerry could, at any time during the term of the lease, or up to March 1, 1951, buy his mother's interest in the farm for $6,000. This option he exercised on January 29, 1951.

Although there was evidence adduced which would support a contrary finding, there was evidence adduced

from which a jury could find as hereinafter set out:

When the father died the family relations were friendly and they continued that way after his death until sometime shortly after Jerry married. When Jerry married and his wife came to live on the home place at first that friendly relationship continued. The working relationship, already referred to, between Jerry's wife and his mother was satisfactory. The three of them all lived on the first floor of the house and ate their meals together.

In May 1949, the home was wired for electricity and an electric washing machine purchased. In addition thereto an icebox was acquired. All this seemed to please the mother. She enjoyed these conveniences and expressed herself to that effect.

The Hortons frequently visited the mother at the farm. Commencing about May 1949 they, particularly Mildred, commenced a course of conduct that had for its evident purpose the destruction of this friendly relationship between Jerry, his wife, and the mother. Mildred commenced advising her mother about what she should do with the eggs her chickens laid, about the milk and cream her cows produced, that she was not getting her fair share of rent, and about other matters. All these matters, prior thereto, were being handled by Jerry, his wife, and mother on an agreed to and satisfactory basis.

Mildred also advised her mother electricity was too expensive; that they had always gotten along before without it; that they did not need an electric washing machine as the old hand-operated washing machine was good enough; that they did not need the icebox but could still use the water barrel down at the windmill, as they had always done.

The mother seems to have been a very nervous and sensitive person, was given to strong feelings. could be easily influenced, and was prone to follow the advice of her daughter Mildred. That she did so is evidenced

by what happened in regard to what has already been referred to. The satisfactory and agreed to arrangements between Jerry, his wife, and the mother in regard to the use of, and proceeds from, the eggs and cream were broken off, difficulties arose in regard to division of rents, and other matters caused misunderstandings. Apparently, because of Mildred's advice, the mother discontinued using the electric washing machine, going back to the hand washer. The barrel at the windmill was used in place of the icebox and she used electricity for lighting sparingly.

It also appears the mother could be easily influenced against people, including her children. All that has been herein set forth ultimately had that effect on the mother's relationship with Jerry and Donice. As a result Jerry and Donice fixed up the upstairs and moved up there to live, the mother no longer eating her meals with them. Finally, on the last Sunday in February 1950, the mother moved out.

When the mother moved out she went to live with the Sperrys at Superior. Again the Hortons entered the picture. Although, as already stated, the mother intended to stay with the Sperrys at least a year, she left them on Sunday, June 18, 1950, in company with the Hortons. It was only 3 days thereafter, on June 21, 1950, that the Hortons and the mother went to a lawyer's office in Kearney and had the will drafted and executed which is here being contested. This will bequeaths to Jerry the sum of $1, to Bessie the sum of $1, and to Mildred and her husband each a one-half interest in all the rest of her property. Thus, in effect, the will, if allowed to probate, would give Mildred and Melvin everything the mother possessed.

At first the mother's finances were handled by Jerry and his wife. However, sometime in June or July 1949, they were taken over by the Hortons. On July 26, 1949, the Hortons opened a savings account for the mother in The Ravenna Bank. That was the bank with

which the Hortons transacted their banking business. Subsequently, on February 1, 1951, they opened a checking account for her in the same bank. At the time of the mother's death the savings account had a balance of $1,882.91 and the checking account $305.05. Although the mother was never actually in the bank, on February 3, 1951, a card, signed by her and Mildred authorizing the bank to pay out such money to either or the survivor, was filed with the bank. On the basis thereof, after the mother's death, the Hortons drew out these balances. They drew out the balance of the savings account on July 13, 1951, and the balance of the checking account on July 14, 1951.

The record shows the Hortons were very anxious to have the mother sell her interest in the farm and were active in bringing about that result. When the mother gave Jerry an opportunity to buy it, by putting an option to that effect in a lease dated November 7, 1949, they were very much dissatisfied by the delay.

It should here be mentioned that on the same day this lease was signed the mother had drafted and caused to be executed a will giving her three children each a one-third interest in whatever property of which she might die seized or possessed.

When Jerry, on January 29, 1951, exercised the option, the mother endorsed the check given in payment thereof and gave it to Melvin. The Hortons, immediately thereafter, began building a home and used the $6,000 to help finance the building thereof. This home, located at 3220 Fourth Avenue in Kearney, Nebraska, they now occupy. The Hortons did not give the mother anything to evidence the $6,000 they received except as it is evidenced by Melvin's signature on the check which was given to the mother in payment of her interest in the farm.

Thus, in regard to the elements necessary to establish undue influence, it appears from the evidence adduced that the testatrix was subject to such influence, especially

by the Hortons; that the opportunity to exercise it existed seems beyond the slightest question; that there was a disposition to exercise it is evidenced by the Hortons' course of conduct that brought about the estrangement between the mother and her other children and their families; and that the result appears to be the effect of such influence is fully evidenced by the fact that prior to her death the Hortons had either obtained or had arranged it so they would obtain, whenever her will was admitted and allowed to probate, everything the mother had when only a short time before, on November 7, 1949, she, by will, had clearly indicated her desire in this respect to the effect that she wanted to treat all of her children alike.

The evidence, if believed, and the jury had a right to believe it, shows a planned scheme or course of conduct on the part of the Hortons which caused the mother to dislike her children Jerry and Bessie and thus enable them, the Hortons, to induce the mother to either transfer to them what little of this world's goods she possessed or give it to them by will. That they would have accomplished this result, except for the jury's verdict, is fully evidenced by the record.

Having come to the foregoing conclusion we affirm the action of the trial court.

AFFIRMED.