IN RE ESTATE OF NELLE O'DONNELL, DECEASED. MARY ELIZABETH SCHLITZ ET AL., APPELLANTS, v. CLARA M. TOPP ET AL., APPELLEES.

64 N. W. 2d 116

Filed April 30, 1954. No. 33447.

*Spear & Lamme* and *Murphy & Murphy,* for appellants.

*Richards, Yost & Schafersman* and *E. L. Mahlin,* for appellees.

Heard before CARTER, MESSMORE, YEAGER, CHAPPELL, WENKE, and BOSLAUGH, JJ.

MESSMORE, J.

This is a will contest in which the validity of an instrument purporting to be the last will and testament of Nelle O'Donnell, deceased, is involved. This appeal is from an order directing a verdict in favor of the proponents of the will and ordering the will admitted to probate.

Contestants allege that Nelle O'Donnell did not have testamentary capacity to make a will on July 2, 1947. They further allege that the purported will was the result of undue influence of the proponents upon Nelle O'Donnell prior to, at the time of making the will, and continuously thereafter up to the date of death of the testatrix; and that for this reason the purported will is not that of Nelle O'Donnell.

The proponents, Clara M. Topp and Adolph J. Topp, and their children Clarence S. Topp and Mabel J. Waters, are the chief beneficiaries of the will, to the exclusion of the contestants.

In determining this appeal, the following rule is applicable: The proponents' motion for directed verdict must be treated as an admission of the truth of the com-

petent evidence adduced by contestants and all proper inferences to be drawn therefrom. See In re Estate of Benson, 153 Neb. 824, 46 N. W. 2d 176.

In addition, the following rule is applicable: It is the duty of trial courts to determine the issues upon which there is competent evidence and submit them, and them only, to the jury. In a will contest on the ground of mental incompetency and undue influence, if the evidence is insufficient to sustain a verdict upon either of such issues in favor of the contestants, then the trial court should withdraw both issues from the jury and direct a verdict or discharge the jury and render judgment for proponents. See, In re Estate of Benson, *supra;* Nebraska Methodist Hospital v. McCloud, 155 Neb. 500, 52 N. W. 2d 325.

In considering this question it is necessary to have in mind certain legal principles governing testamentary capacity as follow: The mental capacity of a testator is tested by the state of his mind at the time he made the will. If the testator knows the extent and character of his property, the natural objects of his bounty, and the purposes of his devises and bequests, he is mentally competent to make a will. See, In re Estate of Inda, 146 Neb. 179, 19 N. W. 2d 37; In re Estate of Benson, *supra.*

The record shows that Mathew O'Donnell, Sr., and his wife Katherine, located on an 80-acre tract of land 3 miles northwest of Colon in Saunders County in 1885. They subsequently acquired an additional 320 acres of land in the same county. They had five children: Nora who was born in 1876 and died in August 1916, without issue and leaving no estate; Mathew Jr., born in 1878; Nelle, the testatrix, born in 1879; Hugh, born in 1882; and Josephine, born in 1885. In 1911, the family moved to 720 East Military Avenue in Fremont, Nebraska, which place remained the home of the family up until the time of the death of the testatrix on December 11, 1952, when she was 73 years of age. She was 68 years of age when

the will in question was made. Katherine O'Donnell died December 25, 1919, and Mathew Sr., died on February 7, 1929. By his will, made in 1923, he gave to his children then living, Josephine, sometimes referred to in the record as Josie, Hugh, and Nelle, all of his property except 80 acres of land which he gave to his grandchildren, the contestants here. In 1926, by a codicil to his will, he rearranged the bequests of real estate which resulted in his giving his grandchildren 80 acres of land which was not as good in productivity as that originally given to them in the will. The will and codicil were contested by the grandchildren. We will make reference to this matter later in the opinion.

Josephine O'Donnell died in July 1930. By her will, her estate was left to Hugh and the testatrix, except $50 to each of her nephews and nieces, the contestants here. Hugh died on May 8, 1947. By his will, his estate was left to the testatrix.

Mathew Jr., married Mary McGinn in 1905. They farmed one of the O'Donnell farms until they moved to Omaha in September 1922, where he died the following Christmas night. They had four children: Mary Elizabeth, born April 9, 1907, now Mary Elizabeth Schiltz; Mathew, born in 1908, now married and living in Arcadia, California; Cecil, born in 1910, married and living in San Francisco, California; and Gladys, born in 1915, living with her mother in Omaha and employed in an Omaha store, who are the contestants.

The attorney who drafted the will of the testatrix testified that he became acquainted with the O'Donnell family in 1909, when he was a classmate of Josephine while attending Fremont normal college. Throughout the years he acted as attorney for different members of the family. He participated in the probate of Katherine O'Donnell's estate. This was when he first met the testatrix. He drafted a will for Mathew O'Donnell, Sr., in 1923 and a codicil thereto in 1926. He drafted Josephine's will in July 1930. He handled legal work in

the Hugh O'Donnell estate. The testatrix was the executrix of Hugh's will. He participated in the contest of the codicil of the will of Mathew O'Donnell, Sr., by these contestants in 1929. During the progress of this contest he instituted a partition action on behalf of Hugh and the testatrix of the home property and land they had an interest in and also in which the mother of these contestants had an interest. There was a complete settlement of this litigation.

He further testified that the testatrix came to his office for the purpose of changing her will after her brother Hugh passed away. She did not say what her intention was at that time, but she believed that she would give some of her estate to charity. He told her to think it over and then they would make a will in accordance with her wishes. She returned to his office on July 1, 1947, and at that time she had a statement in her own handwriting and signed by her dated June 25, 1947. This statement described the real estate she owned, and designated her beneficiaries. In addition, it contained a paragraph to the effect that she did not want the mother of these contestants, nor the contestants, to have any part of her estate. Clara M. Topp was nominated as executrix of her will. When questioned about the residue of her estate, she indicated that her church could use it. The attorney then called in his secretary and certain questions were propounded to the testatrix and answers given thereto which were recorded. The answers in effect were as follows: That since her brother Hugh had passed away she did not know of anyone to whom she wanted to leave her estate; that the Topps had been her neighbors for 20 years, had done many things for her, and she got along well with them; that she had not discussed the making of a will with them; and that on one occasion she told them she would have to change her will as she did not like it as it was. She mentioned the Topps' son, and that he was in the service and had a hard time. She stated that she owned

320 acres of land in Saunders County which she had inherited from her father, her sister Josephine, and her brother Hugh. She wanted to give St. Patrick's Church $200, St. James Orphanage in Omaha $200, and $200 to Boys Town near Omaha. The will was drawn and witnessed by the attorney, his secretary, and Dr. A. J. Merrick. In this will, the testatrix gave the residue of her estate to St. Patrick's Church of Fremont, Nebraska.

On July 2, 1947, the testatrix went to the office of her attorney again and they engaged in a conversation. She had a statement in her own handwriting as of that date to the effect that she desired to give the residue of her estate to Clara M. Topp. She also wanted to raise the bequest to the church from $200 to $300. The other bequests were to stand as they were in the former will. A new will was drafted, executed at Dr. Merrick's office, and attested to by the same witnesses. The attorney was quite sure the will was read to the testatrix and that she was asked if it was her last will and testament, and she replied that it was.

There is other testimony on the part of this witness to the effect that he had known the testatrix 25 or 30 years; and that he had transacted business for her in making her income tax returns since 1947, drawing a couple of farm leases for her, and sending notices to two tenants to vacate.

Both wills heretofore mentioned contain this provision: "I have made no provision herein for the widow, children or grandchildren of my deceased brother, Mathew O'Donnell. I have not overlooked them, but for reasons known not only to myself, but others, I am eliminating them entirely from participating in any part of my estate."

The will gave to Clarence S. Topp, son of the proponents, 160 acres of land in Saunders County; to Mabel J. Waters, daughter of the proponents, 160 acres of land in Saunders County; to the proponents the home property of the testatrix; to St. Patrick's Roman Catholic

Church of Fremont $300; to St. James Orphanage of Omaha $200; to Boys Town near Omaha $200; and to Clara M. Topp the residue of the estate. The will nominated Clara M. Topp as executrix and Adolph J. Topp as executor of the will.

The witnesses to the will, under proper questions with reference to the competency of a person making a will, testified that the testatrix was competent to make a will on the date on which it was made. While the doctor indicated on cross-examination that he had not had ample opportunity to judge the competency of the testatrix to make a will, it is apparent on his re-direct examination that he would not have witnessed a will if he believed the person incompetent to make it.

The contestants predicated error on the trial court rejecting the testimony of the witness Ed Murphy as to his opinion of the testamentary capacity of the testatrix. Without reviewing this evidence, it is apparent that this witness, although well acquainted with the O'Donnell family and relating many instances that occurred in Saunders County, had not seen or visited the testatrix for a number of years at or before the time the will was made; and that he had not talked to her about her relatives nor discussed her property with her. He visited with her occasionally on the streets of Fremont and saw her at funerals many years prior to the time the will was made.

A nonexpert witness who is shown to have had a more or less intimate acquaintance with a person may be permitted to state his opinion as to the mental condition of that person, if said condition becomes a material subject of inquiry, by giving the facts and circumstances upon which the opinion is based. It must appear that a witness, lay or expert, in giving his opinion as to mental capacity of a testator to make a will had in mind the quality of mental capacity essential to the making of a valid will. See, In re Estate of Witte, 145 Neb. 295,

16 N. W. 2d 203; In re Estate of Fehrenkamp, 154 Neb. 488, 48 N. W. 2d 421.

We conclude that this witness failed to meet the requirements as a nonexpert witness testifying to the competency of a person making a will, and the trial court did not err in rejecting his testimony.

The question of testamentary capacity relates exclusively to the time when the will was made, and although competent evidence of the testator's condition of mind long before, closely approaching, and shortly after the time of its execution is admissible, it is received only to assist in revealing his state of mind at that time. Whether or not a testator was justified in making the provisions of a will is of no concern to the courts, provided the testator had the mental capacity to make a valid will. See In re Estate of Fehrenkamp, *supra*.

We find no evidence in the record to sustain the contestants' objection with reference to testamentary capacity, and the trial court did not err in not submitting this issue to the jury.

The next question to determine is whether or not the trial court erred in not submitting the issue of undue influence alleged to have been practiced on the testatrix by Clara M. Topp and Adolph J. Topp, neighbors of the deceased, to the jury.

"The elements necessary to be established to warrant the rejection of a will on the ground of undue influence are (1) that the testator was subject to such influence; (2) that the opportunity to exercise it existed; (3) that there was a disposition to exercise it; and (4) that the result appears to be the effect of such influence." In re Estate of Inda, *supra*. See, also, In re Estate of Scoville, 149 Neb. 415, 31 N. W. 2d 284; In re Estate of Bainbridge, 151 Neb. 142, 36 N. W. 2d 625; In re Estate of Thompson, 153 Neb. 375, 44 N. W. 2d 814; In re Estate of Benson, *supra*.

The burden is on contestants to produce evidence tending to prove each of the four elements stated above,

as a prerequisite of their right to have the issue submitted to a jury for determination. See, In re Estate of George, 144 Neb. 887, 15 N. W. 2d 80; In re Estate of Benson, *supra*. If any one of the essential elements enumerated is not supported by evidence or reasonable inference drawn from a fact or facts otherwise established, the contention of undue influence must be rejected. The evidence must tend to show undue influence directly in reference to the will in question, and be of such a nature as to control the will of the testator and cause him to do something that he did not intend. Suspicion or supposition of undue influence is not sufficient to require the submission of the question to a jury or to sustain a verdict. See, In re Estate of Bayer, 119 Neb. 191, 227 N. W. 928; In re Estate of George, *supra;* In re Estate of Bainbridge, *supra;* In re Estate of Benson, *supra*.

It should be stated here that it is not the function of this court to determine the question whether or not undue influence has been established, but only the question whether or not there was sufficient evidence to justify submission of that question to a jury. See, In re Estate of Kerr, 117 Neb. 630, 222 N. W. 63; In re Estate of Noren, 119 Neb. 653, 230 N. W. 495.

In addition, there are other propositions of law applicable to a determination of this appeal as it relates to undue influence, as follows: A testator may dispose of his property as he pleases. The law does not require that he recognize his relatives therein, nor does it put any obstacle in the way of the aged or infirm in making disposition of their property by will; provided, only, that their mentality conforms to the accepted tests at the time of the execution of such testamentary instrument. See, In re Estate of Bose, 136 Neb. 156, 285 N. W. 319; In re Estate of Goist, 146 Neb. 1, 18 N. W. 2d 513; In re Estate of Benson, *supra*.

Undue influence cannot be inferred alone from motive or opportunity. There must be evidence, direct or cir-

cumstantial, to show that undue influence not only existed, but that it was exercised at the very time the will was executed. Mere suspicion, surmise, or conjecture is not enough to warrant a finding of undue influence. There must be a solid foundation of established facts upon which to rest an inference of its existence. See, In re Estate of Fehrenkamp, *supra*; In re Estate of Witte, *supra*.

We recognize in the case of In re Estate of Bainbridge, *supra*, that in evaluating the testimony and proper inferences therefrom, it is not always possible to apply the evidence tending to establish improper influence which is referable to the will solely to one of the essential elements. It is permissible therefore not to strive to separate each fact supported by evidence offered as proof of undue influence and allocate it under one or more of the four essential elements required to establish the exercise of undue influence, but to view the entire evidence offered by the contestants as proof of this issue and rest the decision upon whether or not the evidence as a whole is of such a substantial nature as to contain some proof of each of the essential elements, and to require that the issue of undue influence be submitted to and determined by a jury.

The testimony adduced in behalf of the contestants on the issue of undue influence was given by distant relatives, old-time friends and acquaintances of the O'Donnell family when they lived in Saunders County and in Fremont, the mother of the contestants, the contestants, tenants of the testatrix and prospective renters of her land, neighbors who lived across the street from her in Fremont, a clergyman of her church, and her doctor. A great part of this evidence is to the same effect, therefore, we summarize that part deemed pertinent to the elements constituting undue influence.

It appears from the record that the testatrix, during her childhood, school, and Sunday school periods in Saunders County, was described as slow to learn, back-

ward, and having had much difficulty in comprehending her lessons. One witness described her in later years as "simple minded," and another witness described her as not possessed of normal understanding or intelligence. When she attended functions, social or otherwise, she was accompanied by a member of the family to and from the same, while her brothers and sisters were not restricted in this respect. She attended country school until she was 17 or 18 years of age and then attended a boarding school in Lincoln for a year. Her brothers and sisters attended Fremont normal college and later taught school or engaged in gainful occupations, while the testatrix stayed at home and did house work described as "menial" work. She had no outside friends as did the other members of the family. Her condition in such respect did not improve, at least, as shown by the testimony, up to the time of her father's death in 1929, when she was 50 or 51 years of age. Beyond this period there is little evidence of this character.

One witness testified that he had been acquainted with the O'Donnell family for a period of 40 years, and visited them on an average of once a month when they lived in Fremont, at least up to the time of the death of Mathew O'Donnell, Sr. He and his wife would take the testatrix riding and to church on many occasions. She would often bring up the subject that someone was after her money and property. He endeavored to comfort her in this respect. At the time of the funeral of his wife, in January 1950, the testatrix brought up this subject again. He suggested that she forget about her property, and leave it to the O'Donnells as her father wanted her to do. She said she believed she would. The granddaughter of this witness testified that she knew the testatrix, especially during the last years of her life, and she would bring up the subject of someone wanting to get her money and property, but would not say who it was.

The testatrix's clergyman, who called on her either

late in 1947 or early in 1948, testified that the testatrix told him that he was after her money. He tried to get her in a better mood by giving her a few pleasantries, and then left.

The mother of the contestants testified that after her husband's death she took in roomers and boarders, was busy raising her family who were attending school, and had difficulty in getting away to visit the testatrix for this reason. She had very little contact with the testatrix after 1930, but talked to her between 1935 and 1938, when she noticed the attitude of the testatrix had changed toward her. With reference to the contest of the codicil involving the will of Mathew O'Donnell, Sr., this witness testified that she informed her attorneys to leave the testatrix out of the matter as she had nothing to do with it and did not understand it. However, it appears in the objections to the codicil to the will of Mathew O'Donnell, Sr., that Josephine and the testatrix were charged with undue influence upon the testator. At that time two of the contestants were adults and two were minors.

There is no evidence to show that the proponents had anything to do, directly or indirectly, with the testatrix's affairs relative to the members of her family. Nor is there any evidence to connect the proponents with the resentment felt by the testatrix against these contestants and their mother. Neither is there evidence to show that the proponents brought about this condition or contributed to it. Also in this connection, the attorney for the testatrix testified that Mrs. Topp called him to tell him the testatrix wanted to see him. She had been hospitalized by her doctor in October 1952. He went to the hospital and had a conversation with the testatrix wherein she requested that the information that she was in the hospital be kept from the newspapers. He explained the difficulty in this respect. Her reason for making the request was that she did not want her nephews or nieces or their mother to know where she

was for fear they would bother her. She did not want to see them. She also inquired about her will and wanted to know if everything was all right, and told him if her nephews or nieces or their mother came to him for the key to her house, not to let them in. She told him where the will was kept. He and Mrs. Topp went into the house and unlocked the box in which the will was kept. Mrs. Topp had a key to this box. He took the will, retained it for awhile, and then deposited it with the county judge.

His secretary testified that when the testatrix was in the office after Hugh's death, she stated that she had given a key to the house to Mrs. Topp so that she could come in and check on her and see that she was all right. With reference to the contestants and their mother, the testatrix said that they had nothing to do with her, and she did not want to see them as they never came to see her. That seemed to be her main complaint and one which she made on more than one occasion. This witness remembered Mrs. Topp being in the office with the testatrix on just one occasion, at a time just before or after Hugh's death, but she took no part in the matters being discussed. She further testified that there was no one with the testatrix when she made the wills on July 1st and 2nd, 1947.

There is also evidence on the part of Mathew O'Donnell and his sister Gladys that when they called to attend Hugh's wake, the testatrix told them: "Why don't you people stay away and quit bothering me." The record shows that Mathew and his brother Cecil only saw the testatrix a few times between 1931 and 1939. Thereafter they had very little contact with her and paid little attention to her. The two nieces did not see her from 1930 to 1947. The O'Donnell family in Omaha received knowledge of Hugh's death through mutual friends, but were not notified by the testatrix.

There is evidence to the effect that a long-time friend and neighbor of the testatrix often saw her in church,

and that the testatrix went down town almost every nice day. They visited back and forth until about a year or so after Hugh's death when the testatrix did not visit this witness any more. This witness endeavored to obtain admittance to the testatrix's home, but without success except on one occasion within a period of a year. Other witnesses testified to the same fact, and that they were unable to contact the testatrix at her home when they believed she was there.

Two neighbors also testified that after Hugh's death Mrs. Topp was at the testatrix's home every day and seemed to have the freedom of the premises.

A tenant of the testatrix from 1934 until the spring of 1952, testified that he met the Topps when they were at the farm in 1935, when the barn was built; that they were at the farm on three occasions with the testatrix, once in 1950; that he saw them when he went to Fremont to transact business with the testatrix; and that the business transacted was solely between the testatrix and him. A question arose involving payment for clover seed under the government program. This witness endeavored to explain the government program to the testatrix, but said that she could not comprehend it, so he gave up and let the matter drop. He received notice to vacate in 1951. He was unsuccessful in ascertaining the reason why he should vacate, and testified that he had always been on friendly terms with the testatrix.

Another tenant of the testatrix from 1931 to 1949, testified that he and his wife were friendly with the testatrix and she visited the farm quite frequently, sometimes staying for a week or more. He also visited the testatrix in her home, and on several occasions before 1946 they exchanged Thanksgiving dinners with each other. In 1947 or 1948, after Hugh's death, the testatrix did not visit the farm but once or twice. He further testified that the Topps came to the farm with the testatrix, but he did not remember how often during the 18

years he resided on the farm. He met them first before Hugh's death. He would not swear, but he thought they were there once after Hugh's death. There had been some talk before Hugh's death with reference to some building to be done on the farm. After Hugh's death he talked the matter over with the testatrix and obtained a carpenter for that purpose. The testatrix canceled the arrangements and told him Mr. Topp had people who were going to do the building on the farm. He received notice to vacate in 1949, and endeavored to ascertain the reason why, but received no response. He further testified that the testatrix was slow to grasp things, and after Hugh's death she did not want anything to do with anyone, even her friends. He had an experience with her with reference to clover seed, which she would not purchase.

From the above evidence it is apparent that the proponents had little, if anything, to do with the relations between these tenants and the testatrix.

A prospective renter, in the first part of September 1951, contacted the testatrix with reference to renting one of her farms which the tenant was vacating. While he was engaged in conversation with the testatrix Mrs. Topp came in and took part in the conversation. She asked him several questions with reference to his ability to farm and the experience he had. When he left, he asked the testatrix to let him know one way or the other. Mrs. Topp said there was no hurry about renting the farm, and that there was plenty of time and plenty of good tenants to whom to rent it.

Dr. Merrick testified that he attended Hugh O'Donnell during his last illness in May 1947, when he first met the testatrix, and met her again on July 1 and 2, 1947, when the wills were made. He attended her professionally in September 1949. He was called by Mrs. Topp to the testatrix's home on October 8, 1952. The testatrix was seriously ill, and he hospitalized her on October 18, 1952. Mrs. Topp was a constant visitor at

the hospital, and seemed to be in charge of the testatrix's affairs. Upon entering the hospital, the testatrix informed him that she desired that only Mrs. Topp enter the room. He visited the testatrix frequently. She was rational, and he would talk to her. A change in her condition occurred on November 20, 1952, when she apparently had a stroke and grew gradually weaker. He met the Topps frequently, and they inquired as to whether the nurse she had was a nurse under his direction or one proposed by her relatives. The doctor also testified that Mrs. Topp solicited his help in not permitting callers to see the testatrix for the reason that her last wishes should be respected.

Other witnesses testified to being at the hospital and being informed by Mrs. Topp that the testatrix was not seriously ill, that she would be home in a few days, and that she was not to receive callers at the hospital. The doctor placed no restrictions on her receiving callers.

The contestant Gladys O'Donnell and her sister Mrs. Schiltz, about two weeks after the testatrix was confined to the hospital, gained admittance to her room. The door was partially open and there was a sign on the door indicating that no visitors were allowed. Their aunt asked them if they had seen the sign on the door, to which they replied that they had been told at the desk that it was all right. She told them that it was not, that the doctor wanted her to rest, and that she could not do it with people running in and out. They terminated their visit. Right afterward they met Mrs. Topp and inquired of their aunt's condition. Mrs. Topp replied that she was not in a serious condition and would be sent home in a few days, but would require nursing. In addition, the statement is attributed to Mrs. Topp that she could not help it if their aunt did not like them, and not to blame her; and that they could go to the house and there was not a plate touched in the house. Mrs. Topp also told these witnesses:

"I do know that Nelle said the O'Donnells in Omaha didn't do anything for her when Hugh died."

There is testimony that the testatrix had a lease on a safe deposit box with a loan association. This lease was dated March 19, 1945, and terminated June 17, 1947. There was also a lease in the joint names of the testatrix and Mrs. Topp, dated June 5, 1947, which terminated June 15, 1950.

There is evidence that Hugh O'Donnell, due to excessive drinking, was committed to a state institution from 1935 to 1939, during which time the testatrix acted as his guardian. While the proponents complained about Hugh's conduct just prior to his commitment, there is no evidence that they were instrumental in bringing about his commitment. Whatever strained relations that might have existed between the testatrix and Hugh as a consequence of his conduct must have been forgotten. The testatrix was the sole beneficiary under his will. None of this was any of the Topps' business, and there is no evidence that they made it their business.

The record shows that on July 2, 1947, the date of the testatrix's will, she had a bank account of $1,157.57. The contestants argue that the change made with reference to the residue of the estate as it appears in the will of July 1, 1947, and the will of July 2, 1947, shows an inference of the exercise of undue influence upon the testatrix by the proponents at that time. From the evidence heretofore recited on the issue of undue influence, this evidence is insufficient to prove undue influence at the time the will was made. The fact that 5 years later, at the time of her death, her bank account had increased to $10,780.01 and she had a substantial amount of grain on her farms as her share of the rent, also that she was frugal and did not equip her home with modern conveniences, does not show evidence of the exercise of undue influence upon her by any person.

There is evidence that neither the contestants nor their mother did anything to cause the disfavor toward

them by the testatrix. They never sought to borrow money from her or in any manner to obtain her property. There is no evidence that the testatrix ever accused them of trying to get her money or property.

For the reasons given in this opinion, the judgment of the trial court in directing a verdict for the proponents should be, and is hereby, affirmed.

AFFIRMED.