IN RE ESTATE OF WILLIAM SCHMITZ, DECEASED. LELAND THOMAS, APPELLANT, V. EVELYN VAUGHAN, APPELLEE, WILLIAM F. DAVIS, GUARDIAN AD LITEM OF DAVID JOHN VAUGHAN ET AL., APPELLANT.

150 N. W. 2d 241

Filed April 28, 1967. No. 36422.

Spencer & Hoch and William F. Davis, for appellants.

Harvey A. Neumeister, William L. Walker, and Earl Ludlam, for appellee.

Heard before WHITE, C. J., SPENCER, BOSLAUGH, SMITH, McCOWN, and NEWTON, JJ., and WHITE, District Judge.

BOSLAUGH, J.

This is an appeal from a decree refusing to admit the will of William Schmitz to probate. The will was admitted to probate in the county court, but upon appeal to the district court the will was denied probate. The executor named in the will and the guardian ad litem for two minor beneficiaries have appealed. For convenience, they will be referred to as the proponents.

William Schmitz died on July 19, 1963. He was survived by a daughter, Evelyn Vaughan, his only child and the contestant, and four grandchildren. His wife, Anna, had died in 1937.

In September 1947, the testator suffered a stroke of paralysis and was hospitalized until January of 1948. He then returned to his home on an 80-acre farm in Otoe County. As a result of the stroke, the testator's left side was paralyzed and he remained an invalid until his death in 1963.

The testator owned an undivided three-fourths interest in the Otoe County farm and in some Kansas land. His daughter, Evelyn, owned the other one-fourth interest. Jesse Vaughan, Evelyn's husband, farmed the Otoe County land and lived on it with his family. The testator lived in a small house which was separate from the house occupied by the Vaughan family.

On January 31, 1953, the testator was moved to a

nursing home in Nebraska City. On February 19, 1953, a guardian was appointed for the person and property of the testator. The order for the appointment of the guardian described the testator as "Mentally Ill."

The will which was offered for probate in this proceeding is dated April 27, 1954. It contains provisions regarding payment of debts, expenses of last illness and burial, and a bequest of $500 for the saying of masses. The will gives the remaining personal property and a life estate in the real property to Evelyn. The remainder interest in the real property is devised to the grandchildren, naming them, and any additional children of Evelyn.

The contestant alleged that the will was not executed, published, or declared according to law; that the testator lacked testamentary capacity; and that the will was the result of undue influence. These issues were submitted to the jury by the trial court. The proponents' principal assignments of error relate to the sufficiency of the evidence to sustain a finding for the contestant upon each issue.

With respect to the execution of the will, there was evidence that the testator asked Joseph Schreiner, his brother-in-law, to ask Vantine A. James, a Nebraska City lawyer, to come to the nursing home and make a will for him. Schreiner and Leo Kreifels, another brother-in-law of the testator, then went to the office of Mr. James and informed him of the testator's request. Mr. Kreifel's wife was a sister of the testator. Mr. Schreiner's wife had been a sister of the testator's wife.

Later on the same day, Mr. James and Dolores Paap, his secretary, went to the nursing home. Joseph Schreiner and Leo Kreifels were there when they arrived. Mr. James talked with the testator and then dictated the will to Mrs. Paap in the presence of the testator. Mrs. Paap typed the will at the nursing home on a typewriter that had been brought for that purpose. The testator examined the will and it was read aloud to him by

Mr. James. The testator declared that the document was his will and signed it in the presence of Mr. James, Mrs. Paap, Joseph Schreiner, Leo Kreifels, and Mary Sullivan, a registered nurse who was then operating the home. Then, at the request of the testator, Mrs. Sullivan, Mrs. Paap, and Mr. James signed as witnesses. This evidence established compliance with the statutory requirements for due execution. § 30-204, R. R. S. 1943.

The will contained an attestation clause which recited the facts necessary to its valid execution. A presumption of due execution arises from the presence of such a clause. In re Estate of Bucy, 150 Neb. 263, 34 N. W. 2d 265; Holyoke v. Sipp, 77 Neb. 394, 109 N. W. 506.

The contestant produced no evidence which might be said to contradict directly the positive testimony of the proponents' witnesses who were present at the time the will was executed. The contestant produced documents dated July 12, 1941, and January 19, 1946, which contained the signature of the testator. These signatures, which were received in evidence, were of little value for the purpose of comparison because they had been made a number of years before the will and before the testator's illness. The testator's signature on a previous will, dated December 9, 1947, compares very favorably with the signature on the April 27, 1954, will. Under the circumstances of this case, the evidence of the contestant was not sufficient to create a question for the jury as to the execution of the will. The issue should not have been submitted to the jury.

The evidence regarding testamentary capacity was in sharp conflict. A person is mentally competent to make a will if, at the time of the execution of the will, he knows the extent and character of his property, the natural objects of his bounty, and the proposed disposition of his property. In re Estate of Goist, 146 Neb. 1, 18 N. W. 2d 513.

The proponents' witnesses testified that the testator

remained mentally alert although he was partially para-
lyzed. Mr. James testified that the testator recognized
him and Mrs. Paap when they entered the room; that
the testator told him in detail how he wanted the will
made; that the testator described his property and stated
how it was to be devised; that he gave the names of the
grandchildren to him; that he examined the will and
asked that it be read out loud to him; and that he said
that the will was made the way he wanted it.

A number of lay witnesses called by the proponents
testified that in their opinion the testator had testa-
mentary capacity. Dr. A. H. Bonebrake, who had been
associated with Dr. Ramaciotti and who cared for the
testator after the death of Dr. Ramaciotti, testified that
in his opinion the testator had testamentary capacity.

The contestant's witnesses testified that after the
stroke the testator's speech was slurred and it was diffi-
cult to understand him; that he spoke mostly of the
past and would repeat the same story over many times;
that he cried frequently for no apparent reason; that he
would refer to his daughter and the ladies taking care
of him as "Annie"; and that he seemed to have no
interest in his land or the condition of the crops.

A number of lay witnesses called by the contestant
testified that in their opinion the testator did not have
testamentary capacity. Dr. John P. Gilligan, who cared
for the testator before his removal to the nursing home
in January 1963, testified that the testator suffered from
cerebral vascular arteriosclerosis which was a progres-
sive condition; that after the stroke the testator was in
a very weakened physical condition and was emotionally
disturbed; that the testator did not have confidence in
his own judgment and stated that he wanted to have a
guardian appointed for him because he felt that he was
"not up to handling his own affairs"; that the change in
his personality was incident to the disease; and that his
mental condition was such that he was subject to per-
suasion by other persons. Dr. Gilligan did not express an

opinion as to the testamentary capacity of the testator.

The evidence with respect to undue influence was largely circumstantial. The previous will, dated December 9, 1947, to which Joseph Schreiner was a witness, gave Evelyn a life estate in the 80-acre Otoe County farm until she reached the age of 50 years, at which time she was to receive the remainder interest. She also received the residue of the estate, both real and personal, after payment of debts and expenses and a $1,000 bequest for the saying of masses. The effect of the 1954 will was to reduce Evelyn's share in her father's real estate to a life estate.

There was evidence of friction between Evelyn's husband and Leo Kreifels that had its origin in religious matters. Evelyn eventually divorced her husband in 1959, some 5 years after the 1954 will was made.

The circumstances surrounding the removal of the testator from his home on the farm to the nursing home were somewhat unusual. Without prior notice to Evelyn, Mr. and Mrs. Kreifels appeared at the farm on January 31, 1953, with an ambulance and moved the testator to the nursing home in Nebraska City. Evelyn and her husband were in Nebraska City on business at the time and did not know what had happened until after the testator had been removed.

Evelyn testified that in May of 1954, Joseph Schreiner asked her to come to his house. Schreiner had also asked Harvey Neumeister, a lawyer from Nebraska City, to be present. Schreiner said that Evelyn's father had made another will, that it was "a good will" for Evelyn but that he could not tell her what was in it. In response to her question as to why another will had been made, Schreiner stated: "We made another will because we wanted to see that everything was the way it should be."

Evelyn further testified that about 2 weeks later she had a conversation with Leo Kreifels. In that conversation, in referring to the making of the will, Kreifels said:

"We wanted to fix it up so everybody would be satisfied, and we took good care of you."

Vantine A. James testified that he had never handled any business for Mr. Schmitz prior to the drafting of the 1954 will. Harvey Neumeister appears as a witness on the 1947 will, as an attorney for the testator on a petition for a decree of heirship of the testator's wife in 1946, and as an attorney for the contestant in this proceeding.

The evidence, considered as a whole, was such that the jury could find that the testator was subject to undue influence, that the opportunity to exercise it existed, that there was a disposition to exercise it for an improper purpose, and that the result appears to be the effect of such influence. The evidence presented a jury question as to both testamentary capacity and as to undue influence. These issues were properly submitted to the jury.

A number of lay witnesses were permitted to testify over objection as to their opinion whether the testator had testamentary capacity. A nonexpert witness who is shown to have had a more or less intimate acquaintance with a person may be permitted to state his opinion as to the mental condition of that person by giving the facts and circumstances upon which the opinion is based. Schlitz v. Topp, 158 Neb. 583, 64 N. W. 2d 116. It must appear that the witness has in mind the quality of mental capacity essential to the making of a valid will and that the facts and circumstances testified to are sufficient upon which to base an opinion. In re Estate of Witte, 145 Neb. 295, 16 N. W. 2d 203.

Two of the grandchildren, Barbara Mullenax and Judy White, were permitted to testify over objection that in their opinion the testator did not have testamentary capacity. This testimony was against their interest because they are remainder beneficiaries under the will. These witnesses were more than 21 years of age at the time of trial, but their opinions were based upon ob-

servations which had been made when they were much younger. They were about 10 years old on the date that the will was made. Objection was made on the ground that they were not of sufficient age to have formed an opinion.

All of the witnesses who testified as to testamentary capacity expressed opinions based upon observations made between 1947 and 1963. It was a matter within the sound discretion of the trial court as to whether any of these witnesses, including the grandchildren, were qualified to express an opinion as to whether the testator had testamentary capacity on April 27, 1954. In re Estate of Goist, *supra*. We think the record fails to show an abuse of discretion and that the objections to the opinion testimony went to weight and credibility rather than admissibility.

It is unnecessary to consider the other errors assigned.

The judgment of the district court is reversed and the cause remanded for new trial.

REVERSED AND REMANDED.